# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60718-2-II |
| Respondent, | |
| v. | |
| RAY JOSEPH GLEASON, | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, J. – Ray Gleason appeals his convictions for vehicular homicide and vehicular assault following a jury trial. The convictions arose out of an incident in which Gleason was driving at a high rate of speed and collided with an oncoming vehicle, killing one person and injuring another. Gleason apparently had a seizure shortly before the collision.

Gleason has a partial complex seizure disorder. During his seizures, he loses consciousness and has no memory of events before, during, or after the seizure. But he often gets preseizure feelings that warn him that a seizure is coming, which gives him time to take action before the seizure occurs.

RCW 46.61.520 and RCW 46.61.522 state that a person commits vehicular homicide and vehicular assault, respectively, when they act "[i]n a reckless manner." Gleason argues the State

presented insufficient evidence that he acted recklessly because his seizure made him lose consciousness, which prevented him from forming the required intent to be convicted.

We hold that a rational juror could conclude beyond a reasonable doubt that Gleason had preseizure feelings and failed to pull off the road before the seizure occurred and therefore acted in a reckless manner. Accordingly, we affirm Gleason's convictions for vehicular homicide and vehicular assault.

FACTS

On October 26, 2020, Washington State Patrol Officer Caleb Ecklund observed Gleason's car drive past him westbound on U.S. Highway 12 at a high speed. Ecklund's radar registered Gleason's speed at 103 miles per hour. Ecklund began to follow Gleason's car and eventually saw that it had collided with another vehicle. Ecklund first checked on the occupants of the other vehicle and extinguished a fire in that vehicle. He then went to Gleason's vehicle, which was about 75 yards away. When Ecklund approached Gleason's vehicle, Gleason was not responsive, his eyes were open but he was staring forward, and he was holding the car's registration document in his hands.

Tyler Collins, the driver of the car Gleason collided with, suffered a broken wrist. James Smith, the passenger in Collins's vehicle, died of blunt force injuries.

Gleason was diagnosed with a seizure disorder 20 years before the accident. He managed the seizures through medication. Gleason testified that he loses consciousness and cannot feel anything when he has a seizure. Gleason believes that he had a seizure on the day of the accident.

The State charged Gleason with vehicular homicide and vehicular assault. In the information, the State alleged for both charges that Gleason drove both in a reckless manner or with disregard for the safety of others.

At trial, it was undisputed that Gleason drove his car and that the collision resulted in Smith's death and Collins's injuries. The primary issue was whether Gleason acted recklessly or with disregard for others' safety given the fact that he apparently had a seizure shortly before the collision.

*State's Evidence*

Ecklund testified consistent with the facts stated above. Ecklund testified that Gleason's vehicle had crossed the center line into the eastbound lane when he drove by Ecklund's patrol car. He also stated that there was no indication that Gleason attempted to slow down his car. In addition, Ecklund testified that on the part of Highway 12 where the accident occurred, there was a series of small curves. Ecklund stated that it did not appear that Gleason turned his car with any of the curves in the road, and instead he drove straight down the highway.

Michelle Harbaugh is an emergency medical technician (EMT) who responded to the scene of the accident. Harbaugh testified that when she approached Gleason's vehicle at the accident scene, Gleason was repeating himself and not making eye contact, a sign of altered mental status. Gleason would not respond to instructions from the EMTs. Harbaugh observed Gleason have seizure-like activity in the ambulance, including shaking and tensing of his muscles. Harbaugh testified that Gleason never was alert enough to have a conversation. Harbaugh stated that Gleason had continued seizure activity the entire time she was with him.

Washington State Patrol Sergeant Michael Huhta testified that he was the collision investigator at the accident. Huhta interviewed Gleason approximately a week after the accident.

3

Gleason told him that he suffered from a seizure disorder. Gleason said that he can tell when a seizure is about to occur because he gets an aura sensation. When he experienced an aura, "he would stop what he's doing or lie down or something so he wouldn't injure himself." Rep. of Proc. (RP) at 197. Huhta asked Gleason what he would do if he had an aura while driving, and Gleason said he would pull over and stop no matter where he was at.

Huhta retrieved data from Gleason's car at the time of the accident. Huhta testified that the car's data showed that Gleason was driving 103 miles per hour at the time of the collision. Huhta testified that the accident scene showed that Gleason hit a guardrail on one of the curves in the highway shortly before the collision.

On cross-examination, Huhta stated that the car's black box data showed that Gleason did not apply his brakes or steer within approximately five seconds before the collision. Huhta stated that Gleason experiencing a seizure was a possible explanation for the collision.

When Huhta interviewed Gleason, he said that he had not had a seizure in the last six months. Huhta also reviewed Gleason's medical records, which he received through a search warrant. The records indicated that Gleason last had a seizure about six months before the accident.

The State also admitted prior testimony from Christopher Wassmer. Wassmer was a truck driver who observed Gleason drive by him. He observed a car behind him go by at "unreal speed." Ex. 94 at 8. He observed Gleason's car swerving between lanes.

Dr. Chike Linton was Gleason's neurologist from 2018 until after the accident. Dr. Linton testified that Gleason previously was diagnosed with complex partial seizures with secondary generalization.

Complex partial seizures start in one part of the brain and then move to other parts of the brain, resulting in a full body seizure. During a complex partial seizure, a person loses awareness and then has a larger seizure event. And during the larger seizure, a person loses consciousness. Dr. Linton stated that when a person like Gleason has a seizure, they may not be aware of their surroundings or they may be confused. They may make abnormal sounds or see and hear things that are not there. This transitions to shaking and convulsing of the body and loss of consciousness.

Dr. Linton stated that a person having a complex seizure loses control of their body, and their arms and legs tense. It would be nearly impossible to perform complex tasks because the person experiences uncontrollable movement. Dr. Linton testified that during a seizure, it would be very difficult for a person to control a vehicle, turn a steering wheel, or slow down.

Dr. Linton testified that it is possible for some people with complex partial seizures to have a phenomenon called an "aura" before a seizure occurs. RP at 275. During an aura, a person will feel like something is about to happen, or a change that indicates a seizure might happen.

Q. Do you know, did Mr. Gleason -- did he describe the ability to sense if a seizure was coming?

A. I don't have any independent memory of that. But I believe there is a note that did reflect a concern for an aura.

Q. Okay. So he told you he was having these auras?

A. I believe so based on my chart notes.

Q. Okay. At least in your chart notes, if the term "aura" was used, if you can recall, would that have been a term that Mr. Gleason used, or that you just surmised was an aura?

A. It would be most likely a term that I would have surmised based upon the description.

5

Q. Okay. Based upon the description that was coming from Mr. Gleason?

A. That's correct.

RP at 275-76.

Dr. Linton testified that in September 2020 he had an appointment with Gleason. At the appointment Gleason was concerned that he had "two episodes where he awakened, . . . feeling disoriented and having impaired speech." RP at 281. Dr. Linton testified that he had a concern that Gleason may have had either some type of breakthrough seizure or something that resembled a seizure event in his sleep.

Dr. Linton considered Gleason's complaint of disorientation and impaired speech as a "breakthrough event," a deviation from his normal controlled management, because his medication was supposed to prevent seizures. RP at 283. Before this event, Gleason's medications were controlling his seizures. Dr. Linton suggested that Gleason increase his dose of seizure medication to give Gleason more protection from seizures, but Gleason was not amenable to his suggestion and declined to increase his dosage. However, Dr. Linton ordered a sleep study to determine if Gleason had sleep apnea that increases the risk of seizures.

At the September 2020 visit, Dr. Linton discussed driving restrictions with Gleason.

Q. What driving restrictions did you advise Mr. Gleason of?

A. So, typically, it's my habit of practice to advise at least six months or more, with certain exceptions, of no driving or operating heavy machinery if there are concerns for a seizure event or the possibility of having a seizure.

Q. Okay. And that's -- that's medical advice?

A. Yes, it is.

Q. Okay. And did you express to Mr. Gleason at this visit that you had a concern that what he was complaining of waking up like that, that could be seizure activity?

6

A. Yes.

Q. Okay. So he was aware that there was a potential he was having seizures and that you gave him the driving restrictions advisement?

A. Yes.

RP at 285.

Dr. Linton had another appointment with Gleason on October 21, 2020 to go over the result of the sleep study and to check in on Gleason's symptoms. During that appointment, Dr. Linton did not mention driving restrictions to Gleason because "the previous driving restrictions were still in play. There was no change to his medical management." RP at 290. And that driving restriction was "do not drive unless you're going to change your medications." RP at 290. At the October visit, Gleason still was not amenable to increasing his medication.

In conclusion, Dr. Linton gave the following opinion:

Q. Okay. So in your medical opinion, given what we know from the September 20th -- excuse me, September 21st and October 21st visit and the defendant's complaint of seizure activity and the fact that he's refusing to increase his medications, was he safe to drive as it relates to his seizure activity?

A. In my opinion, no.

RP at 291.

On cross-examination, Dr. Linton testified that his notes from the September 2020 appointment stated that Gleason's last seizure event was in April 2020. Dr. Linton's notes stated that he discussed driving restrictions, but did not state what they specifically were. Dr. Linton's notes stated that Gleason should continue his medication. Dr. Linton acknowledged that he did not mention driving restrictions at the October 2020 appointment. Dr. Linton testified that October 2020 would have been six months from his last noted seizure event. Dr. Linton stated that he did not know what Gleason's specific aura symptoms were.

*Defense Testimony*

Michelle Minor, Gleason's cousin by marriage, testified that she had seen Gleason have seizures many times. Minor testified that Gleason typically was aware that he was going to have a seizure "[j]ust before" they are going to happen. RP at 482. But Minor testified that Gleason also previously had seizures without warning. Minor stated that Gleason always waited six months after a seizure before driving.

Dr. Harold Rappaport testified as Gleason's medical expert. Dr. Rappaport testified that in his opinion, Dr. Linton never explained to Gleason what an aura was. This was important because an aura with different symptoms could indicate a different seizure disorder. Dr. Rappaport testified that Dr. Linton's failure to explain this to Gleason meant that there was an unclear diagnosis of whether Gleason in fact experienced a seizure event in his sleep. Dr. Rappoport's opinion was that Dr. Linton's note about a nonspecific aura was insufficient to restart the six month waiting period on driving.

Dr. Rappaport also testified that while Gleason was on seizure medication, the medication could lessen the symptoms of an aura even though an aura occurred. He testified that it was his opinion that Gleason's seizure activity would have prevented him from moving his foot from the gas pedal to the brake pedal at the time of the accident. Dr. Rappaport also testified that the beginning of a seizure would affect Gleason's ability to control a vehicle. Dr. Rappaport suggested that there was about five to 10 seconds between when Gleason had preseizure feelings and a seizure.

Gleason testified in his own defense. Gleason stated that during a seizure he loses consciousness. Gleason can experience a preseizure feeling – a ringing in his ears, a sense of elevation gain, and a sweet taste. He testified that he does not always have an aura or preseizure

feeling before a seizure. However, Gleason said that the last time he had a seizure without the preseizure feeling was five years ago.

Gleason testified that at his September 2020 appointment he told Dr. Linton about a potential seizure in his sleep in mid-March 2020. He did not report any seizures since then. Dr. Linton told him that he should not drive until the six-month period was over, but Dr. Linton did not indicate that he should wait any longer to drive than the six months since his seizure in March. Gleason stated that he did not drive at all between his seizure in March and the September visit.

Gleason saw Dr. Linton again on October 21. Dr. Linton did not mention anything about driving during that visit. Gleason testified that if Dr. Linton had told him not to drive for a few more months, he would have followed that advice.

Gleason testified that he took his medication the morning of the accident before getting in his car. He stated that he had no memory of leaving his house or the accident. Gleason testified that the reason he had no memory was because he had a seizure.

On cross-examination, Gleason testified as follows:

Q. Yeah. You can tell when you're about to have a seizure?

A. I am -- I have warning signs, yes.

Q. Okay. And I believe you said that primarily it's a ringing in your ear, and then issues with taste -- or was it issues with smell?

A. Ringing in my ear, there's some taste.

RP at 657. Gleason stated that he is hyperaware of these symptoms because he does not want to injure himself or someone else. Gleason discussed an incident when he heard ringing in his ears when dropping off his son at school, and removed himself from the school grounds to lay down. Another time when he experienced these indicators while hunting, and he lay down in a tent.

*Verdict*

The jury found Gleason guilty of vehicular homicide and vehicular assault. For both convictions, the jury found that Gleason operated a motor vehicle in a reckless manner. The jury specifically found that Gleason did not act with disregard for the safety of others.[1]

Gleason appeals his convictions.

ANALYSIS

A.      STANDARD OF REVIEW

The test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025). We do not weigh conflicting testimony, credibility of witnesses, or the persuasiveness of evidence. *Id.* at 234.

B.      RELEVANT STATUTES

RCW 46.61.520(1) states that a driver is guilty of vehicular homicide if driving a vehicle causes the death of a person and "the driver was operating a motor vehicle . . . (b) In a reckless manner."

RCW 46.61.522(1) states that a driver is guilty of vehicular assault if the driver "operates or drives any vehicle . . . (a) In a reckless manner and causes substantial bodily harm to another."

Driving in a reckless manner under both statutes means "to operate a vehicle in a rash or heedless manner, indifferent to the consequences." *State v. Roggenkamp*, 153 Wn.2d 614, 631, 106 P.3d 196 (2005) (internal quotations omitted).

---

[1] Despite the jury's specific finding, the trial court issued a sentence below the standard range for vehicular homicide in a reckless manner and sentenced Gleason to a standard range sentence for vehicular homicide when acting with disregard for the safety of others.

C.     ANALYSIS

Gleason argues that the State presented insufficient evidence that he acted in a reckless manner.  We disagree.

1.    Gleason's Seizure

Gleason argues that because he had a seizure, he was unconscious and unable to form any thought before and during the accident.  The State briefly suggests that Gleason did not lose consciousness during the accident because Ecklund observed Gleason holding his car registration after the accident.

However, the fact that Gleason may have regained some consciousness after the accident enough to grab his registration does not indicate that Gleason was conscious at the time of the accident.  Several minutes passed after the collision before Ecklund checked on Gleason.  And at that point Gleason was conscious, but unresponsive.

All the evidence was consistent with Gleason having a seizure.  Ecklund testified that when he approached the car, Gleason was unresponsive and staring straight ahead, which was consistent with testimony about Gleason's post-seizure symptoms.  Harbaugh testified that Gleason was in an altered state when she approached his car and that Gleason experienced seizures in the ambulance after the accident.  Huhta testified that data from Gleason's vehicle showed that he did not apply any brakes in the time before the crash.  None of this evidence supports an inference that Gleason was conscious at the time of the accident.  And the unexplained fact that Gleason was holding his registration does not negate this undisputed evidence.

We conclude that even viewed in the light most favorable to the State, the evidence supports a finding that Gleason experienced a seizure shortly before the accident.

11

2.  Reckless Driving

In light of the fact that Gleason had a seizure and lost consciousness, the issue is whether the State presented sufficient evidence that Gleason's knowledge of his seizure disorder's characteristics could allow a rational juror to determine that Gleason acted in a "heedless manner, indifferent to the consequences" at the time of the accident. *Roggenkamp*, 153 Wn.2d at 631. Viewing the evidence in the light favorable to the State, we conclude that a rational juror could determine that Gleason acted in a reckless manner.

Gleason argues that in the time shortly before the accident, he experienced a seizure that caused him to lose consciousness and lose physical control of his actions. He claims that at that point, he could not consciously form the mens rea to drive recklessly. However, the State focuses on the brief period before the seizure occurred. The State emphasizes that Gleason typically had preseizure feelings before a seizure occurred, and it can be inferred that he had preseizure feelings in this incident. Once he experienced those feelings, he had time to pull off the road. The State claims that the failure to stop driving was reckless.

There is evidence that supports the State's argument. Dr. Linton testified that Gleason told him about experiencing auras, a sense that a seizure was coming. Gleason also told Huhta that he can tell when a seizure is about to occur because he gets an aura sensation. Gleason acknowledged that he had warning signs before experiencing a seizure – ringing in his ears and a particular taste. It had been over five years since he had a seizure without those feelings. Gleason stated that he is hyperaware of these symptoms because he does not want to injure himself or someone else. Although there is no direct evidence, a reasonable inference is that Gleason had preseizure feelings before the accident.

There was evidence Gleason's seizures occurred five to 10 seconds after the preseizure feelings. And he recounted two incidents in which he felt the preseizure feelings and took steps to remove himself from a situation and lay down. Gleason told Huhta that when he experienced an aura, "he would stop what he's doing or lie down or something so he wouldn't injure himself." RP at 197. Although there is no direct evidence, a reasonable inference is that Gleason had time to pull off the road before the seizure occurred.

We conclude that viewing this evidence in the light most favorable to the State, a rational juror could find that Gleason drove recklessly because he experienced preseizure feelings, had time to pull off the road before the seizure started, and failed to do so.

Accordingly, we hold that the State presented sufficient evidence for a jury to convict Gleason of vehicular homicide and vehicular assault.

CONCLUSION

We affirm Gleason's convictions of vehicular homicide and vehicular assault.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

PRICE, A.C.J.

GLASGOW, J.